UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GILBERT DEMETRIUS AGUILAR,

Petitioner,

v.

TIMOTHY FILSON, *et al.*,

Respondents.

Case No. 3:12-cv-00397-MMD-WGC

ORDER

## I. INTRODUCTION

This action is a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Gilbert Demetrius Aguilar, a Nevada prisoner. The action is before the Court with respect to the merits of the claims remaining in Aguilar's second amended habeas petition ("Petition"). The Court will deny the Petition.

## II. BACKGROUND

In its opinion on Aguilar's direct appeal, the Nevada Supreme Court described the factual background of this case as follows:

> On the evening of August 7, 1996, a store clerk ejected David and Gilbert Aguilar from a Las Vegas 7-Eleven outlet for drinking alcohol on the premises. Immediately thereafter, without apparent reason or provocation, Gilbert attacked a man seated in his automobile in the store's parking lot. In his attempt to flee, the man struck Gilbert with his automobile. Gilbert was uninjured.
>
> After retrieving rifles from their apartment, the pair returned to the 7-Eleven parking lot in search of the man. Thinking that they recognized the driver of a passing automobile, they both commenced firing, striking several cars and houses in the process. Upon hearing the shooting, Mark Emerson, a nearby

resident, stepped outside onto his patio and telephoned the police. Unfortunately, he was struck by the rifle fire and expired en route to a local hospital.

Police arrested David Aguilar that evening at the scene. Gilbert Aguilar was not apprehended until nine days later. Both brothers were charged and convicted as described. They were tried together in a single proceeding.

(Order Dismissing Appeals, Exh. 5 at 2-3 (ECF No. 30-5 at 4-5).)

Aguilar was found guilty of conspiracy to commit murder, murder with the use of a deadly weapon, possession of a firearm by an ex-felon, two counts of discharging a firearm at or into a structure, and discharging a firearm at or into a vehicle. The State sought the death penalty on the murder conviction. The jury, however, set Aguilar's penalty, for the murder, at life imprisonment without the possibility of parole. The State sought adjudication of Aguilar as a habitual criminal. The trial court ultimately sentenced Aguilar to the following prison sentences, all to run consecutively: for the conspiracy to commit murder, eight to twenty years; for the murder, two consecutive terms of life without the possibility of parole; for possession of a firearm by an ex-felon, eight to twenty years; for each of the two counts of discharging a firearm at or into a structure, eight to twenty years; and for discharging a firearm at or into a vehicle, eight to twenty years. (*See* Judgment of Conviction, Exh. 2 (ECF No. 30-2).) David was convicted of the same crimes, except for being an ex-felon in possession of a firearm, but was sentenced differently.

Aguilar and his brother both appealed; the Nevada Supreme Court consolidated their appeals, and on December 20, 1999, ruling on the merits of their claims, dismissed the appeal. (*See* Order Dismissing Appeals, Exh. 5 (ECF No. 30-5).)

Aguilar filed his first state-court habeas corpus petition on September 8, 2000. (*See* Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 7 (ECF No. 30-7).) The state district court held an evidentiary hearing, and then denied the petition in a written order filed on February 8, 2008. (*See* Findings of Fact, Conclusions of Law and Order, Exh. 14 (ECF No. 32).) Aguilar appealed, and the Nevada Supreme Court reversed and remanded on September 5, 2008, directing the district court to appoint counsel. (*See* Order of Reversal and Remand, Exh. 16 (ECF No. 32-2).) On remand, the state district court

appointed counsel for Aguilar, held a further evidentiary hearing, and again denied Aguilar's petition in a written order filed on March 1, 2011. (*See* Findings of Fact, Conclusions of Law and Order, Exh. 18 (ECF No. 32-4).) Aguilar appealed, and the Nevada Supreme Court affirmed on March 9, 2012. (*See* Order of Affirmance, Exh. 21 (ECF No. 32-7).)

Aguilar initiated this federal habeas corpus action on July 27, 2012. (*See* Petition for Writ of Habeas Corpus (ECF No. 8).) The Court appointed counsel for Aguilar (ECF Nos. 18, 20), and, with counsel, Aguilar filed a first amended habeas petition on December 11, 2013 (ECF No. 30). Respondents filed a motion to dismiss the first amended petition. (ECF No. 54.) On September 19, 2014, the Court granted that motion in part and denied it in part; the Court found two claims to be unexhausted in state court, and granted Aguilar an opportunity to make an election regarding those claims. (ECF No. 56.) Aguilar filed a motion for a stay, to allow him to exhaust his unexhausted claims (ECF No. 57), as well as a motion for leave of court to file a second amended petition (ECF No. 58). On May 19, 2015, the Court granted both motions. (ECF No. 60.) The case was then stayed, and Aguilar filed his second amended petition, which is now the operative petition, on June 12, 2015. (ECF No. 62.)

Aguilar's second amended petition asserts six grounds for relief, the sixth with eight sub-claims, as follows:

> 1.     Aguilar's federal constitutional rights were violated because the trial court admitted "highly prejudicial evidence of other wrongs."
>
> 2.     Aguilar's federal constitutional rights were violated because the trial court admitted "totally irrelevant evidence of a bayonet and machete being found in defendant's apartment."
>
> 3.     Aguilar's federal constitutional rights were violated as a result of instructions given to the jury regarding the elements of first degree murder.
>
> 4.     Aguilar's federal constitutional rights were violated because the trial court refused admission of evidence offered by Aguilar regarding parole eligibility.
>
> 5.     Aguilar's federal constitutional rights were violated because the trial court allowed the State to file a notice of habitual criminality after the jury's verdicts in both phases of the trial.

3

6.    Aguilar's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel.

6A.    Trial counsel "was ineffective for failing to investigate and present evidence that the weapon used to kill the victim belonged to a police officer and that the police officer may have fired the fatal shot."

6B.    Trial counsel was ineffective for not preventing the admission of evidence that Aguilar had a prior felony conviction.

6C.    "Trial counsel was ineffective for failing to investigate and present evidence that the weapon used to kill Mark Emerson belonged to Officer Brian Debecker and that the officer may have [fired] the fatal shot."

6D.    "Trial counsel was ineffective for failing to effectively prevent the admission of the tainted, unreliable and suggestive extra-judicial and in-court photographic lineup identification . . . ."

6E.    "Trial counsel was ineffective for failing to file a motion to suppress the search of Gloria Olivares'[s] apartment."

6F.    "Trial counsel was ineffective for failing to prevent the video from the 7-11 from being admitted at trial and for failing to investigate another theory of defense."

6G.    "Trial counsel was ineffective for failing to move to suppress the evidence of the palm print of David Aguilar found on the Maadi semi-automatic rifle found in Gloria Olivares'[s] apartment."

6H.    "Trial counsel was ineffective for failing to prevent Annette Aguilar from testifying."

(Second Amended Petition (ECF No. 62), at 9-44.)

On July 2, 2015, Aguilar commenced a second state habeas action. (*See* Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 1 to Motion to Lift Stay (ECF No. 64-1).) In an order filed September 14, 2015, the state district court denied Aguilar's petition, finding that it was untimely and successive. (*See* Findings of Fact, Conclusions of Law and Order, Exh. 2 to Motion to Lift Stay (ECF No. 64-2).) Aguilar appealed, and the Nevada Supreme Court affirmed on April 14, 2016. (*See* Order of Affirmance, Exh. 5 to Motion to Lift Stay (ECF No. 64-5).) The stay of this action was then lifted, on a motion by Aguilar, on June 6, 2016. (*See* Order entered June 6, 2016 (ECF No. 65).)

Respondents filed a motion to dismiss Aguilar's second amended petition on September 20, 2016. (ECF No. 68.) In that motion, Respondents asserted that Grounds 1

4

1   and 3 of the Petition are barred by the doctrine of procedural default, and should be

2   dismissed. On November 29, 2016, the Court granted the motion to dismiss in part and

3   denied it in part. (ECF No. 70.) The Court granted the motion with respect to Ground 1,

4   and dismissed that claim as procedurally defaulted; regarding Ground 3, the Court denied

5   the motion to dismiss, without prejudice to Respondents asserting the cause and prejudice

6   defense to that claim in their answer. (*Id.*)

7       Respondents filed an answer on April 27, 2017. (ECF No. 76.) Aguilar filed a reply

8   on June 7, 2017. (ECF No. 77.)

9       Aguilar's brother and codefendant, David Aguilar, also pursued a federal habeas

10  corpus action in this Court, and the Court denied relief in that case. (*See* Case No. 3:12-

11  cv-00315-MMD-VPC.) The Court takes judicial notice of the proceedings in that case.

12  **III.   DISCUSSION**

13      **A.   Standard of Review**

14      28 U.S.C. § 2254(d) sets forth the standard of review applicable in this case under

15  the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

16      An application for a writ of habeas corpus on behalf of a person in custody
        pursuant to the judgment of a State court shall not be granted with respect
17      to any claim that was adjudicated on the merits in State court proceedings
        unless the adjudication of the claim --
18
        (1) resulted in a decision that was contrary to, or involved an unreasonable
19      application of, clearly established Federal law, as determined by the
        Supreme Court of the United States; or
20
        (2) resulted in a decision that was based on an unreasonable determination
21      of the facts in light of the evidence presented in the State court proceeding.

22  28 U.S.C. § 2254(d).

23      A state court decision is contrary to clearly established Supreme Court precedent,

24  within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts

25  the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts

26  a set of facts that are materially indistinguishable from a decision of [the Supreme Court]

27  and nevertheless arrives at a result different from [the Supreme Court's] precedent."

28  ///

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (first quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); then citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted) (describing standard as "a difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt").

## B. Ground 2

In Ground 2 of his Petition, Aguilar claims that his federal constitutional rights were violated because the trial court admitted "totally irrelevant evidence of a bayonet and machete being found in defendant's apartment." (Second Amended Petition (ECF No. 62), at 11-13.) The evidence at issue in this claim consisted of a machete and a bayonet found in the apartment that was apparently rented by David Aguilar's girlfriend, Gloria. Those items were found by the apartment manager, who turned them over to the police. (*See* ///

6

Transcript of Trial, October 8, 1997, Exh. 29 at 2-7 (ECF No. 42 at 3-8) (testimony of George Trombley); *id.* at 10-13 (ECF No. 42 at 11-14) (testimony of Howard Hall).)

The Nevada Supreme Court ruled on a related state-law claim, on Aguilar's direct appeal, as follows:

> On the day following the incident, the manager of the apartment complex in which Gilbert and David resided found several rounds of ammunition, a machete, and a bayonet in their apartment. This was accomplished at the instance [sic] of the apartment owners. These items were all turned over to the police.
>
> At trial, the machete and bayonet were admitted into evidence over David's relevancy objection. David challenges this ruling on appeal. [Footnote: Gilbert does not seek review of this issue in his appeal. Again, because we have consolidated these appeals, our ruling on this issue applies equally to Gilbert.] The State contends that the items were relevant to show that Gilbert may have returned to the apartment after the police's departure in order to dispose of items other than the AK-47 that he might have been carrying on the night of the shooting.
>
> The determination of whether to admit evidence is within the sound discretion of the district court, and such determinations will not be disturbed unless manifestly wrong. *See* [*Petrocelli v. State*, 692 P.2d 503, 508 (Nev. 1985)]. NRS 48.015 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."
>
> Neither the machete nor the bayonet tended to make the existence of any fact of consequence regarding the charged offenses more probable than without the evidence. As such, we conclude that the district court erred in admitting the two items into evidence. However, we further conclude that the error was harmless in light of the overwhelming evidence against both of these appellants. *See* NRS 178.598 (Any error that does not affect substantial rights shall be disregarded.); *see also Big Pond v. State*, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985) (Whether error is harmless or prejudicial depends on whether the issue of innocence or guilt is close, quantity and character of error, and gravity of crime charged.); *Walker v. State*, 113, Nev. 853, 872, 944 P.2d 762, 774 (1997).

(Order Dismissing Appeals, Exh. 5 at 3-4 (ECF No. 30-5 at 5-6).)

The state trial court's admission of evidence is not grounds for federal habeas corpus relief unless a specific constitutional guarantee is violated, or the error is of such magnitude that the result was a denial of the defendant's right to a fundamentally fair trial guaranteed by due process clause of the federal constitution. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). To show that improper admission of evidence violated

his due process rights, the federal habeas petitioner must demonstrate that the admission of the challenged evidence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Patterson v. New York*, 432 U.S. 197, 202 (1977) (internal citations and quotations omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 43 (1996).

The United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Nor has the Supreme Court held that the introduction of evidence of prior bad acts, or other evidence to show propensity to commit a crime, violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). Citing the Supreme Court's express reservation of judgment on the issue, the Ninth Circuit Court of Appeals has held that federal habeas corpus relief is unavailable based on a state court's admission into evidence of prior bad acts or propensity evidence. *See Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting habeas petitioner's challenge to introduction of propensity evidence because petitioner could point to no Supreme Court precedent establishing that admission of such evidence violated Constitution).

In its ruling on Aguilar's direct appeal, the Nevada Supreme Court discussed the question of the admissibility of the evidence regarding the machete and bayonet only on state law grounds. The Nevada Supreme Court's construction of Nevada law is authoritative, and is not subject to review in this federal habeas corpus action. *See Estelle*, 502 U.S. at 67-68; *Bonin v. Calderon*, 59 F.3d 815, 841 (9th Cir. 1995). The Nevada Supreme Court did not provide any analysis regarding Aguilar's federal constitutional claim. "Where a state court's decision is unaccompanied by an explanation, the habeas

///

petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

Aguilar points to no United States Supreme Court precedent that, as a federal constitutional matter, precludes the introduction of evidence such as that at issue here, and that was unreasonably applied by the Nevada Supreme Court.

Moreover, the evidence regarding the machete and the bayonet did not render Aguilar's trial fundamentally unfair. There was overwhelming evidence presented at trial showing Aguilar's guilt. The evidence at trial firmly established that Aguilar and his brother committed violent crimes—they shot numerous rounds from semi-automatic weapons in and around a Las Vegas apartment complex, and, in doing so, killed a person. (*See, e.g.*, Transcript of Trial, October 2, 1997, Exh. 25 at 65-83 (ECF No. 37 at 66-84) (testimony of Joyce Marie Brown, a resident of the apartment complex, who, on the night of the shooting, saw Aguilar and his brother walk by her residence, with Aguilar carrying a gun); Transcript of Trial, October 3, 1997, Exh. 26 at 11-23 (ECF No. 38 at 12-24) (testimony of Terry Maldonado, who witnessed the shooting, and heard two different voices exclaim, "Did you get him, did you get him?" and "Come out, motherfucker"); Transcript of Trial, October 3, 1997, Exh. 26 at 43-45 (ECF No. 38 at 44-46) (testimony of Mark Evans, who heard the shooting, and also heard an angry voice say "Come out, motherfucker"); Transcript of Trial, October 3, 1997, Exh. 26 at 57-97 (ECF No. 38 at 58-98) (testimony of Annette Aguilar, Aguilar's girlfriend (she and Aguilar later married), who was with Aguilar before the shooting, during part of the shooting, and after the shooting); Transcript of Trial, October 3, 1997, Exh. 26 at 165-80 (ECF No. 38 at 166-81) (testimony of Marla Jean Emerson, whose husband was killed, who heard the gunfire and saw her husband go out onto their patio, heard her husband scream when he was shot, and saw Aguilar standing with a gun near her fatally wounded husband, saying to her, "Who's in there?"); Transcript of Trial, October 6, 1997, Exh. 27 at 74-99 (ECF No. 40 at 75-100) (testimony of Chad Brown, a Las Vegas Metropolitan Police Department ("LVMPD") officer who responded to the scene, and observed a person who looked like Aguilar shooting a gun, ordered the

shooter to put down his gun, was shot at, and exchanged fire with the shooter); Transcript of Trial, October 6, 1997, Exh. 28 at 74-79 (ECF No. 41 at 88-93) (testimony of Rickey J. Workman, an LVMPD crime scene analyst, who, soon after the shooting, found, in Gloria's apartment, among other items, two AK-47 style semi-automatic rifles, and a pair of pants, the pockets of which contained a wallet containing Aguilar's identification and twenty-three live rifle cartridges of a size that could be shot by either of the two guns found in the apartment); Transcript of Trial, October 8, 1997, Exh. 29 at 50-83 (ECF No. 42 at 51-84) (testimony of Torrey Johnson, an LVMPD firearms examiner, whose testimony linked bullet casings found at the scene of the crimes to the two rifles found in the apartment).) In short, the evidence regarding the machete and bayonet was insignificant in the context of the strong evidence showing Aguilar's guilt.

The Nevada Supreme Court reasonably affirmed the denial of relief with respect to the claim that Aguilar's federal constitutional rights were violated by the admission of the evidence regarding the machete and bayonet. Whether or not the admission of the evidence was error under Nevada law, the admission of that evidence was not contrary to, or an unreasonable application of, any clearly established federal law, and it did not render Aguilar's trial unfair. The Court will deny habeas corpus relief on Ground 2.

## C.    Ground 3

In Ground 3, Aguilar claims that his federal constitutional rights were violated as a result of instructions given to the jury regarding the elements of first degree murder. (Second Amended Petition (ECF No. 62) at 13-19.)

In the order entered on September 19, 2014, the Court ruled that Ground 3 was, at that time, wholly unexhausted. (*See* Order entered September 19, 2014 (ECF No. 56) at 4-5.) Then, while this action was stayed, Aguilar asserted this claim in his second state habeas action, and the Nevada Supreme Court held that action was procedurally barred, as it was untimely and successive, and further held that Aguilar did not show cause and prejudice to overcome the procedural bar. (*See* Order of Affirmance, Exh. 5 to Motion to ///

1   Lift Stay (ECF No. 64-5).) Therefore, Ground 3 is barred by the federal procedural default

2   doctrine absent a showing of cause and prejudice or a fundamental miscarriage of justice.

3       Aguilar has, in the past, argued that there is cause and prejudice, with respect to

4   the procedural default, to the extent that Ground 3 is based on the Ninth Circuit Court of

5   Appeals' decision in *Babb v. Lozowsky*, 704 F.3d 1246 (9th Cir. 2013), because *Babb* had

6   not yet been decided when his first state habeas action was completed. (*See* Motion for

7   Stay and Abeyance (ECF No. 57) at 4; Opposition to Motion to Dismiss (ECF No. 69) at

8   2-3.) However, in his reply to Respondents' answer, Aguilar does not assert that argument,

9   or any other coherent argument that he can show cause and prejudice or a miscarriage of

10  justice. (*See* Reply (ECF No. 77) at 4-5.)

11      And, at any rate—perhaps explaining Aguilar's abandonment of his argument—

12  *Babb* is no longer good law with regard to federal habeas petitioners, such as Aguilar

13  claims to be, whose convictions were not yet final when the Nevada Supreme Court

14  decided *Byford v. State*, 994 P.2d 700 (2000). *See Moore v. Helling*, 763 F.3d 1011, 1015-

15  18 (9th Cir. 2014). To the extent Ground 3 is based on *Babb*, the claim would fail.

16  Therefore, Aguilar cannot show prejudice.

17      The Court will deny relief on Ground 3 as it is barred by the procedural default

18  doctrine.

19      **D.   Ground 4**

20      In Ground 4, Aguilar claims that his federal constitutional rights were violated

21  because the trial court refused admission of evidence offered by Aguilar regarding parole

22  eligibility. (Second Amended Petition (ECF No. 62) at 19-24.) The evidence that Aguilar

23  offered, and that was excluded by the trial court, was testimony of the chairman of the

24  Nevada State Parole Board, regarding the parole process, Aguilar's potential eligibility for

25  parole, and the factors that might be considered in determining Aguilar's parole eligibility.

26  As this Court understands Aguilar's position, he sought to introduce such evidence to

27  counter the prosecution's contention that he would pose a danger in the future, by showing

28  ///

that, if sentenced to life with the possibility of parole, his chances of being granted parole would be slim.

Aguilar asserted this claim on his direct appeal, and the Nevada Supreme Court ruled as follows:

> At the penalty phase of the trial, Gilbert attempted to call the chairman of the Nevada State Parole Board as a witness to testify about the parole process, Gilbert's eligibility for parole, and the factors that might be considered in determining Gilbert's parole eligibility. The district court refused to allow Gilbert to call the witness, distinguishing *Geary v. State*, 112 Nev. 1434, 930 P.2d 719 (1996).
>
> Gilbert contends that the exclusion of this evidence was error, because the jury instructions provided did not adequately cover the points he was attempting to establish through the chairman's testimony. [Footnote: Specifically, Gilbert argues that the jury instructions did not outline the factors the parole board considers in making parole determinations. Because, David Aguilar was given consecutive sentences of life *with* the possibility of parole, he is not a party to this issue on appeal.] The State argues that the testimony Gilbert sought to introduce was unnecessary because the court adequately instructed the jury on all sentencing options.
>
> "By statute, questions of admissibility during the penalty phase of a capital murder trial are largely left to the discretion of the trial judge." *Milligan v. State*, 101 Nev. 627, 636, 708 P.2d 289, 295 (1985) (citing NRS 175.552). We conclude that the district court did not abuse its discretion.
>
> Here, the district court instructed the jury in the following manner:
>
> > The jury shall fix the punishment at:
> >
> > (1) Life imprisonment without the possibility of parole, which means exactly what it says, that the defendant shall not be eligible for parole;
> >
> > (2) Life imprisonment with the possibility of parole, with eligibility for parole beginning when a minimum of 40 years has been served;
> >
> > (3) A definite term of 100 years, with eligibility for parole beginning when a minimum of 40 years has been served; or
> >
> > (4) death
> >
> > * * *
> >
> > Life imprisonment with the possibility of parole is a sentence of life imprisonment which provides that a defendant would be eligible for parole after a period of forty years. This does not mean that he would be paroled after forty years, but only that he would be eligible after that period of time.

> Life imprisonment without the possibility of parole means exactly what it says, that a defendant shall not be eligible for parole.
>
> If you sentence a defendant to death, you must assume that the sentence will be carried out.
>
> Although under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences, the law does not allow the board to change either a death sentence or a sentence of life without the possibility of parole to any lesser or different sentence. Therefore, you are instructed that you may not speculate as to whether the sentence you impose may be changed at a later date.
>
> The above-quoted jury instruction, in expressly stating to the jury that a sentence of life without the possibility of parole cannot be commuted, precluded the jury from having a "false choice" in deciding Gilbert's sentence. Accordingly, we conclude that the trial court did not err in refusing admission of Gilbert's evidence regarding his parole eligibility. Further, any evidence regarding Gilbert's individual parole eligibility would have been wholly speculative.

(Order Dismissing Appeals, Exh. 5 at 9-11 (ECF No. 30-5 at 11-13).)

The Nevada Supreme Court's analysis addressed only the question whether the exclusion of Aguilar's evidence violated state law. This ruling, on the state-law claim, is not subject to review here. *See Estelle*, 502 U.S. at 67-68; *Bonin*, 59 F.3d at 841. The Nevada Supreme Court did not provide any analysis regarding Aguilar's claim that the exclusion of the evidence violated his federal constitutional rights, and, again, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

Aguilar points to no United States Supreme Court precedent that, as a federal constitutional matter, required the state trial court to allow introduction of evidence such as that at issue here, and that was unreasonably applied by the Nevada Supreme Court.

Aguilar cites *Simmons v. South Carolina*, 512 U.S. 154 (1994). (*See* Second Amended Petition (ECF No. 62) at 21-22.) In *Simmons*, the Court held that inaccurate instructions about parole eligibility may deprive a defendant of due process when the defendant's future dangerousness is at issue in a capital sentencing. *Simmons*, 512 U.S. at 163-66. In *Simmons*, the trial court refused the petitioner's request to instruct the jury

13

that a sentence of life imprisonment would include no possibility of parole. *Id.* at 160. During the sentencing phase of the capital trial, "[t]he State raised the specter of the petitioner's future dangerousness," but "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested." *Id.* at 165-66. *Simmons* stands for the proposition that, in a capital sentencing, a jury must be instructed regarding the defendant's *ineligibility* for parole if sentenced to life in prison without possibility of parole. The state trial court's instructions to the jury in this case complied with that requirement. The jury was instructed that, if sentenced to life in prison with the possibility of parole, Aguilar would be eligible for parole, but if sentenced to life in prison without the possibility of parole, he would be ineligible for parole. *Simmons* did not require the trial court to allow the sort of testimony, of the chairman of the Nevada State Parole Board, proffered by Aguilar. The Nevada Supreme Court did not unreasonably apply *Simmons*.

Aguilar also cites *California v. Ramos*, 463 U.S. 992 (1983). In *Ramos*, the Court held that instructions to a capital sentencing jury may include accurate information regarding the Governor's authority to commute a sentence of life without the possibility of parole to a sentence including the possibility of parole. *Ramos*, 463 U.S. at 1001. *Ramos* is plainly inapposite.

Aguilar has not shown that, in denying relief on this claim, the Nevada Supreme Court unreasonably applied *Simmons* or *Ramos*, or any other Supreme Court precedent. The Nevada Supreme Court reasonably determined that the exclusion of testimony of the chairman of the Nevada State Parole Board was not contrary to, or an unreasonable application of, any clearly established federal law. The Court will deny habeas corpus relief on Ground 4.

### E.    Ground 5

In Ground 5, Aguilar claims that his federal constitutional rights were violated because the trial court allowed the State to file a notice of habitual criminality after the

14

1    jury's verdicts in both phases of the trial. (Second Amended Petition (ECF No. 62) at 25-
2    28.) Aguilar contends that he was prejudiced by the timing of the notice of habitual
3    criminality, as follows:

4         This practice precluded the defense from using the possibility of an
          enhanced sentence to argue in favor of Life With the Possibility of Parole.
5         Had the jury been aware of the fact that Aguilar may have received a
          sentence of 100 years, in addition to two consecutive life sentences, it could
6         be that Aguilar would have received a sentence of Life Without the Possibility
          of Parole.
7

8    (*Id.* at 25-26.)

9         Aguilar raised this claim on his direct appeal, and the Nevada Supreme Court ruled
10   as follows:

11        Following the penalty phase of the trial but before formal sentencing, the
          State filed a notice that it would seek enhancement of Gilbert's sentence
12        under NRS 207.010, the Nevada habitual criminal statute. Gilbert argues
          that the post-trial filing, pursuant to NRS 207.016, precluded him from using
13        the possibility of enhanced sentencing as a habitual criminal in support of a
          sentence of life with the possibility of parole during the penalty phase of the
14        trial. The State argues that the notice was properly filed pursuant to the
          statute.
15
          NRS 207.016(2) provides, in relevant part, "a count pursuant to NRS
16        207.010 . . . may be separately filed after conviction of the primary offense,
          but if it is so filed, sentence must not be imposed . . . until 15 days after the
17        separate filing." [Footnote, setting forth text of NRS 207.010(1), omitted.]
          Gilbert contends that the notice was improperly filed because the beginning
18        of the penalty hearing constituted the commencement of sentencing.

19        We conclude that Gilbert's contention lacks merit. Although the filing of the
          notice of habitual criminality against Gilbert may have added more time to
20        his sentence, the State acted within the confines of the relevant statute.

21   (Order Dismissing Appeals, Exh. 5 at 11-12 (ECF No. 30-5 at 13-14).)

22        Here again, the Nevada Supreme Court discussed only the state-law issue, which

23   is not subject to review in this case (*see Estelle*, 502 U.S. at 67-68; *Bonin*, 59 F.3d at 841);

24   the court did not discuss Aguilar's claim that the timing of the notice violated his federal

25   constitutional rights. "Where a state court's decision is unaccompanied by an explanation,

26   the habeas petitioner's burden still must be met by showing there was no reasonable basis

27   for the state court to deny relief." *Harrington*, 562 U.S. at 98.

28   ///

Aguilar cites *Gardner v. Florida*, 430 U.S. 349 (1977), in support of his claim, and argues:

> Not only was it improper for the state to file a Notice of Habitual Criminality after the verdict but this practice infringed on the substantial rights of Aguilar. *See Gardner v. Florida*, 430 U.S. 349 (1977) (holding that the accused must be afforded the right to deny or explain evidence presented against him).

(Second Amended Petition (ECF No. 62), at 26.) In *Gardner*, the Supreme Court held that a death sentence could not constitutionally be based on evidence—in that case, information in a portion of a presentence report not disclosed to the defense—that was not disclosed to the defense and that the defense was precluded from rebutting. *Gardner*, 430 U.S. at 362 ("We conclude that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain."). *Gardner* does not support Aguilar's claim. First, the defendant in *Gardner* was sentenced to death, and the Supreme Court's ruling was based in part on the notion that "death is a different kind of punishment from any other which may be imposed in this country." *Id.* at 357-58. And, second, the issue in *Gardner* was the fact that the death sentence was based to some extent on *evidence* not disclosed to the defense. That is not the case here. The issue in this case is the sufficiency of the notice to Aguilar that the State would seek sentencing under the habitual criminal statute. It was not unreasonable for the Nevada Supreme Court to determine that *Gardner* did not impose a constitutional requirement of earlier notice that the State would seek sentencing of Aguilar as a habitual criminal.

Aguilar also cites *Lockett v. Ohio*, 428 U.S. 586 (1978). In *Lockett*, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 428 U.S. at 604. That holding has no bearing on the issue raised by Aguilar in Ground 5.

///

The Nevada Supreme Court did not unreasonably apply *Gardner* or *Lockett*, or any other Supreme Court precedent. The Nevada Supreme Court reasonably determined that the Aguilar's federal constitutional rights were not violated on account of the timing of the notice of his sentencing under Nevada's habitual criminal statute. The Court will deny habeas corpus relief on Ground 5.

### F.    Ground 6

In Ground 6, Aguilar claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel. (Second Amended Petition (ECF No. 62) at 29-44.) Ground 6 includes eight separate claims of ineffective assistance of trial counsel, designated Grounds 6A through 6H.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two-prong test for claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

Where a state court has adjudicated a claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable under the AEDPA is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the Supreme Court instructed:

*///*

17

The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (9th Cir. 2010) (acknowledging double deference required for state court adjudications of *Strickland* claims).

In Ground 6A, Aguilar claims that his trial counsel "was ineffective for failing to investigate and present evidence that the weapon used to kill the victim belonged to a police officer and that the police officer may have fired the fatal shot." (Second Amended Petition (ECF No. 62) at 29-30.) And, similarly, in Ground 6C, Aguilar claims that his "[t]rial counsel was ineffective for failing to investigate and present evidence that the weapon used to kill Mark Emerson belonged to Officer Brian Debecker and that the officer may have [fired] the fatal shot." (*Id.* at 33-35.)

Aguilar asserted these claims in his first state habeas action, and, after holding an evidentiary hearing, the state district court ruled:

> [C]ounsel cannot be deemed ineffective for deciding against presenting a theory of the case that Officer Brian Debecker could have been the shooter because (1) there was no evidence to support this theory, (2) there was no evidence that Officer Debecker was anywhere near the 7-Eleven on the night in question, and (3) this would [have] allowed for the introduction of other crimes, namely, that the AK-45 assault rifle had been stolen a year and a half prior to trial and the thief had never been caught.

(Findings of Fact, Conclusions of Law and Order, Exh. 14 at 5 (ECF No. 32 at 7).) And, on the appeal in Aguilar's first state habeas action, the Nevada Supreme Court ruled as follows:

> [A]ppellants claim that trial counsel were ineffective for failing to investigate and present evidence that the weapon used to kill the victim belonged to a police officer and that the police officer may have fired the fatal shot. Appellants fail to demonstrate that trial counsel were deficient. Trial counsel testified at the evidentiary hearing that there was a tactical reason for not

presenting this evidence: one of the appellants had prior convictions or arrests for dealing in stolen weapons. Trial counsel made a tactical decision that they did not want the jury to hear that evidence and make a connection that appellants stole the guns used in the crime. Therefore, the district court did not err in denying this claim.

(Order of Affirmance, Exh. 21 at 2 (ECF No. 32-7 at 4).) The Nevada Supreme Court's ruling on this claim was reasonable. Aguilar claims his trial counsel was ineffective for failing to investigate whether Officer Debecker—who had apparently once owned the murder weapon, and from whom it had apparently been stolen some time before the crimes in this case—was at the scene of the crimes. However, Aguilar does not demonstrate what any such investigation would have shown. There has never been any showing that Officer Debecker was anywhere near the scene of the crimes. Furthermore, counsel made a reasonable tactical decision at trial not to raise the issue of the police officer's prior ownership of the gun, as it would have allowed an inference that Aguilar had stolen the gun.[1]

In Ground 6B, Aguilar claims that his trial counsel was ineffective for not preventing the admission of evidence that Aguilar had a prior felony conviction. (Second Amended Petition (ECF No. 62) at 30-33.) On the appeal in his Aguilar's first state habeas action, the Nevada Supreme Court ruled on this claim as follows:

[A]ppellants claim that trial counsel were ineffective for failing to prevent the admission of evidence that appellant Gilbert had a prior felony conviction. Specifically, appellant Gilbert was also charged with felon in possession of a firearm, and this charge was read to the jury. Appellants fail to demonstrate that trial counsel were deficient. This case was tried prior to this court's decision in *Brown v. State*, which requires that a felon-in-possession count be bifurcated into a separate trial. 114 Nev. 11118, 1126, 967 P.2d 1126, 1131 (1998). At the evidentiary hearing, trial counsel testified that they did in fact attempt to prevent the admission that appellant Gilbert had a prior felony conviction. This was unsuccessful. [Footnote: Trial counsel did keep the nature of the previous conviction from being introduced [at] trial by stipulating that Gilbert was a felon.]

///

_____

[1]In his federal habeas corpus action in this Court, David Aguilar asserted a similar claim, regarding his counsel's handling of the issue of the stolen gun; the Court denied David Aguilar relief on the claim. (*See* Case No. 3:12-cv-00315-MMD-VPC, ECF No. 71 at 21-32.)

(Order of Affirmation, Exh. 21 at 4 (ECF No. 32-7 at 6).) The Nevada Supreme Court's ruling on this claim was reasonable because Aguilar does not make any showing that his counsel could have done anything beyond what was done to attempt to obtain a severance of the ex-felon in possession of a firearm charge. After the evidentiary hearing in Aguilar's first state habeas action, the state district court found that counsel did in fact move for such a severance before trial, and then again after the trial had commenced. (*See* Findings of Fact, Conclusions of Law and Order, Exh. 14 at 5-6 (ECF No. 32 at 7-8).) The state district court found that the motions were futile given Nevada law at the time. (*See id.*) Aguilar does not show these findings to be unreasonable determinations of the facts in light of the evidence presented.

In Ground 6D, Aguilar claims that his trial counsel was "ineffective for failing to effectively prevent the admission of the tainted, unreliable and suggestive extra-judicial and in-court photographic lineup identification . . . ." (Second Amended Petition (ECF No. 62) at 35-36.) This claim concerns the identification of Aguilar by witness Joyce Marie Brown. On the appeal in Aguilar's first state habeas action, the Nevada Supreme Court ruled on this claim as follows:

> [A]ppellants claim that trial counsel were ineffective for failing to challenge the photo line-up that was admitted at trial. Specifically, appellants claim that the photo shows appellant Gilbert in his jail clothing. Appellants fail to demonstrate that trial counsel were deficient. At the evidentiary hearing, trial counsel testified that they did not believe they had any grounds to challenge the photo line-up because while, to a person familiar with jail clothing, the picture did show appellant Gilbert in his jail clothing, a person unfamiliar with jail clothing would have thought he was wearing a t-shirt. Trial counsel is not required to make futile objections. *Donovan v. State*, 94 Nev. 671, 584 P.2d 708 (1978).

(Order of Affirmation, Exh. 21 at 2-3 (ECF No. 32-7 at 4-5).) This part of the Nevada Supreme Court's ruling was plainly reasonable; Aguilar makes no showing otherwise. To the extent that Aguilar claims that the photographic lineup was presented to the witness in a suggestive manner, in that the police officers allegedly prompted the witness, the Nevada Supreme Court added, in a footnote:

///

To the extent that appellant claims that trial counsel should have filed a pretrial motion to suppress the photo line-up because the officers may have prompted the eye witnesses, appellant failed to demonstrate that this claim had merit. Appellants failed to provide this court with a copy of the trial transcripts. The burden is on appellants to provide an adequate record enabling this court to review assignments of error. *See Thomas v. State*, 120 Nev. 37, 43 n.4, 83 P.3d 818, 822 n.4 (2004); *see also Greene v. State*, 96 Nev. 555, 558, 612 P.2d 686, 688 (1980); *Jacobs v. State*, 91 Nev. 155, 158, 532 P.2d 1034, 1036 (1975).

(*Id.* at 3 n.1.) This ruling, too, was reasonable, given the record before the Nevada Supreme Court. Aguilar does not show that there was any viable ground upon which his trial counsel could have successfully suppressed Joyce Marie Brown's identification testimony.[2]

In Ground 6E, Aguilar claims that his "[t]rial counsel was ineffective for failing to file a motion to suppress the search of Gloria Olivares'[s] apartment." (Second Amended Petition (ECF No. 62) at 36-40.) And, in Ground 6G, Aguilar claims that his "[t]rial counsel was ineffective for failing to move to suppress the evidence of the palm print of David Aguilar found on the Maadi semi-automatic rifle found in Gloria Olivares'[s] apartment." (*Id.* at 41-43.) Aguilar raised these claims in his first state habeas action, and the state district court ruled as follows:

Defendant's claim that counsel was ineffective for not challenging the search of Ms. Olivares'[s] apartment and allowing her to testify as to whether her consent was voluntary is without merit as neither [of the] Defendants had standing to object to the search of Ms. Olivares'[s] apartment. Neither Defendant lived at the apartment or had any possessory interest in the apartment. However, defense counsel did bring out the fact that the two assault weapons used in the shooting were found in Ms. Olivares'[s] apartment rather than Defendants' apartment and that no weapons were found in Defendants' apartment.

* * *

The warrantless search of Gloria Jean Olivares'[s] residence was properly conducted pursuant to voluntary consent. Defendants have no standing to contest the consensual search of Gloria Olivares'[s] home. Even assuming, *arguendo*, that Defendants did have proper standing to challenge the search, Ms. Olivares voluntarily consented to the search. At the grand jury hearing, Ms. Olivares testified that she voluntarily signed the consent form.

---

[2]This Court denied David Aguilar relief on a similar claim in his case. (*See* ECF No. 71 in Case No. 3:12-cv-00315-MMD-VPC, ECF No. 71 at 33-42.)

> Q. Now sometime later that evening of August 7th, 1996, or going into the early morning hours of August the 8th, do you recall the police asking you for a consent to search your apartment?
>
> A. Yes.
>
> Q. And did you, in fact, give them consent to search the apartment?
>
> A. Yes.
>
> Q. And you, in fact, signed the consent to search, is that correct?
>
> A. Yes.
>
> Q. Let me just show you this document. Does that appear to be a copy of the consent to search?
>
> A. Yes.

Grand Jury Transcript, pp. 97-8. In addition, Officer Mark Dwiggins testified at trial that although Ms. Olivares wavered several times on whether to give consent and even refused to sign twice, she ultimately signed a consent form agreeing to the search to rule her out as having any involvement in the incident. TT, Vol. VI, pp. 50-1.

(Findings of Fact, Conclusions of Law and Order, Exh. 14 at 6-7, 10 (ECF No. 32 at 8-9, 12).) Then, on the appeal in Aguilar's first state habeas action, the Nevada Supreme Court ruled on this claim as follows:

> [A]ppellants claim that trial counsel were ineffective for failing to file a motion to suppress the search of David's girlfriend's apartment. Appellants fail to demonstrate that trial counsel were deficient because they failed to demonstrate that they had standing to challenge the search. The apartment belonged to David's girlfriend and there was a restraining order preventing him from entering the premises. Thus, they did not demonstrate that they had a protected privacy interest in the apartment. *Rakas v. Illinois*, 439 U.S. 128, 130-31 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search."); *Katz v. United States*, 389 U.S. 347, 352 (1967) (recognizing that the Fourth Amendment requires an inquiry into whether the person claiming the protection was entitled to assume privacy at the place and under the circumstances concerned); *see also State v. Taylor*, 114 Nev. 1071, 1077, 968 P.2d 315, 320 (1998) (recognizing that one must have an objective and subjective expectation of privacy in the place to be searched).
>
> * * *
>
> [A]ppellants claim that counsel were ineffective for failing to prevent the admission of forensics regarding the gun that was found in appellant's girlfriend's apartment. Appellants claim that the fact that one of the guns had appellant David's palm print on it was irrelevant evidence because it could not be shown that the gun was the murder weapon. This claim lacks merit.

> This evidence was highly probative because shells found at the scene matched the guns found in the girlfriend's apartment. [Footnote: The victim was killed by a shot that went completely through his body. The bullet was never recovered.]

(Order of Affirmance, Exh. 21 at 3-4, 6 (ECF No. 32-7 at 5-6, 8).) Aguilar does not make any showing that the state courts' rulings regarding the search—that Aguilar had no standing to challenge the search, and that Gloria's consent to the search was valid—were unreasonable in light of the evidence presented. Nor has Aguilar shown that further investigation by his counsel would have had any impact on those determinations. The Nevada Supreme Court's ruling on this claim was reasonable.[3] And, to the extent that the Nevada courts determined that the evidence of David Aguilar's palm print on one of the guns was relevant evidence, that is a ruling on a matter of state law, beyond the purview of this federal habeas court. *See Estelle*, 502 U.S. at 67-68; *Bonin*, 59 F.3d at 841. Aguilar makes no showing that the admission of that evidence violated his federal constitutional rights. The Nevada Supreme Court's rulings on the claims in Ground 6E and 6G were reasonable in light of the evidence presented.

In Ground 6F, Aguilar claims: "Trial counsel was ineffective for failing to prevent the video from the 7-11 from being admitted at trial and for failing to investigate another theory of defense." (Second Amended Petition (ECF No. 62) at 40-41.) On the appeal in Aguilar's first state habeas action, the Nevada Supreme Court ruled as follows on such a claim:

> [A]ppellants claim that counsel were ineffective for failing to prevent the video from 7-11 from being admitted at trial. Specifically, they claim that trial counsel failed to question the authenticity of the tape's time stamp or the editing techniques. Further, trial counsel never filed a motion to suppress the videotape. Appellants fail to demonstrate that trial counsel were deficient. Appellants fail to demonstrate that there was reason to question the authenticity of the time stamp or editing techniques. Further appellants fail to demonstrate that a motion to suppress would have been successful.

> * * *

> [A]ppellants claim that trial counsel were ineffective for failing to investigate another defense. [Footnote omitted.] Specifically, appellants claim trial counsel should have attempted to identify a man who was at the 7-11 and

---

[3]This Court denied David Aguilar relief on a similar claim in his case. (*See* Case No. 3:12-cv-00315-MMD-VPC, ECF No. 71 at 43-50.)

may have met the description of the shooter. Appellants fail to demonstrate that trial counsel were deficient. Trial counsel testified that they did not pursue this theory because it was impossible to identify who this man was. Further, trial counsel testified at the evidentiary hearing that the witness who gave the description of the shooter identified appellant Gilbert as the shooter in court. Therefore, the district court did not err in denying this claim.

(Order of Affirmance, Exh. 21 at 6-7 (ECF No. 32-7 at 8-9).) Regarding the first part of

Ground 6F—that Aguilar's trial counsel was ineffective for failing to prevent the admission

of the videotape into evidence—the claim is meritless; Aguilar makes no allegation or

argument whatsoever in this case as to how his counsel could have prevented the

admission of the videotape into evidence.[4] (*See* Second Amended Petition (ECF No. 62)

at 40-41.) As for the second part of Ground 6F—that trial counsel was ineffective for not

investigating another theory of defense based on the videotape—Aguilar does not show

the Nevada Supreme Court's ruling to be unreasonable. Aguilar has never made any

showing that his trial counsel could have identified the person seen on the videotape, or

that trial counsel could have done anything further to develop a defense based on that

evidence.[5]

Finally, in Ground 6H, Aguilar claims: "Trial counsel was ineffective for failing to

prevent Annette Aguilar from testifying." (Second Amended Petition (ECF No. 62) at

43-44.) On the appeal in Aguilar's first state habeas action, the Nevada Supreme Court

ruled on this claim as follows:

[A]ppellants claim that counsel were ineffective for failing to prevent a witness, appellant Gilbert's girlfriend, from testifying at trial. Specifically, appellants claim that the girlfriend was coerced and that her testimony should have been inadmissible based on marital privilege. Appellants fail to demonstrate that trial counsel were deficient. First, appellants fail to present any evidence that the girlfriend was coerced into testifying. Second, the marital privilege does not apply to girlfriends. [Footnote: To the extent that Gilbert appears to claim that he and his girlfriend were in a common-law marriage relationship, NRS 49.295 still would not apply. Nevada does not recognize common-law marriages. NRS 122.010.] NRS 49.295. Further, trial

_____

[4]This Court denied David Aguilar relief on a similar claim in his case. (*See* ECF No. 71 in Case No. 3:12-cv-00315-MMD-VPC, ECF No. 71 at 50-57.)

[5]Here, too, this Court denied David Aguilar relief on a similar claim in his case. (*See* Case No. 3:12-cv-00315-MMD-VPC, ECF No. 57-63.)

24

counsel testified at the evidentiary hearing that they argued against allowing this witness to testify to the point that the district court threatened to hold them in contempt.

(Order of Affirmance, Exh. 21 at 5 (ECF No. 32-7 at 7).) This claim is meritless. The Nevada Supreme Court's application of the marital privilege was a matter of state law, not subject to review in this federal habeas action. *See Estelle*, 502 U.S. at 67-68; *Bonin*, 59 F.3d at 841. And, Aguilar's contention that Annette's testimony was coerced is conclusory; Aguilar does not establish that there was any viable basis for his counsel to have prevented her testimony. The Nevada Supreme Court's ruling on the claims in Ground 6H was reasonable in light of the evidence presented, and it was not contrary to, or an unreasonable application of, Supreme Court precedent.

In sum, Aguilar does not show any of the Nevada Supreme Court's rulings on his claims of ineffective assistance of counsel to have been contrary to, or an unreasonable application of, *Strickland*, or any other Supreme Court precedent, and Aguilar does not show any of those rulings to have been unreasonable in light of the evidence presented. The Court will deny habeas corpus relief on the claims in Ground 6.

## IV.    CERTIFICATE OF APPEALABILITY

The standard for issuance of a certificate of appealability is governed by 28 U.S.C. § 2253(c). The Supreme Court has interpreted section 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). Applying this standard, the Court finds that a certificate of appealability is unwarranted.

## V.    CONCLUSION

It is therefore ordered that the Second Amended Petition for Writ of Habeas Corpus (ECF No. 62) is denied.

It is further ordered that Petitioner is denied a certificate of appealability.

It is further ordered that the Clerk of the Court is to enter judgment accordingly.

DATED THIS 10th day of July 2018.

_____
MIRANDA M. DU,
UNITED STATES DISTRICT JUDGE